UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION

IN RE:

STEPHAN OLSON                                           Chapter 7

      Debtor.                          Bankruptcy No. 03-04787S

INTEGRATED PRACTICE MANAGEMENT, INC.

      Plaintiff

v.                                     Adversary No. 04-9051S

STEPHAN OLSON

      Defendant.


ORDER RE COMPLAINT

      The matter before the court is final trial of the plaintiff's
complaint to determine the dischargeability of debt owed to it by
Stephan Olson.  Trial was held January 25-27, 2005 in Sioux City.
Attorney Jeana L. Goosmann represented the plaintiff, Integrated
Practice Management, Inc. ("Integrated").  Attorney Wil L. Forker
represented defendant Stephan Olson.  This is a core proceeding
pursuant to 28 U.S.C. § 157(b)(2)(I).


FINDINGS OF FACT

      Stephan Olson, age 42, resides in Correctionville.  In about
the mid-1990s, he was employed by Hoffman Agency as an insurance
representative.  In about 1999 he formed Castle Rock Development,
L.L.C. as its sole member and manager.  The business was involved
in real estate development and construction.  Castle Rock's first
project was the River Valley housing development in

Correctionville.  The project was planned in two phases.  The
completed project was to have approximately sixty lots.  The first
phase was begun, and four or five houses have been built.

In late 1999 or early 2000, Olson and Castle Rock were
involved in the building of a medical clinic in Correctionville.
The clinic was built for Third Rock Leasing, L.L.C.  Castle Rock
owned 80% of Third Rock and Olson was a member of Third Rock.
Several other people invested in the clinic.  St. Luke's Medical
Center operated the clinic.  In 2002, Third Rock sold the clinic
to St. Luke's for approximately $600,000.  The clinic has since
closed, and the building is being used as a church.

In 2000 Castle Rock also built Naps Alabama Barbeque, a
restaurant owned by Tri Nic, L.L.C.  Olson was the sole member and
manager of Tri Nic.  In 2003, Tri Nic filed a Chapter 11
bankruptcy petition.  The case was converted to Chapter 7 later
that year.  Castle Rock ceased operations in 2004.

Integrated Practice Management is the management company of
Multi Care Physicians Group, a clinic that offers care by a
chiropractor, a medical doctor, a physical therapist and a massage
therapist.  Dr. Scott Sneller is a doctor of chiropractic.  He is
co-owner of the Multi Care clinic and president of Integrated.

The Multi Care clinic is located on Stadium Drive in Sioux
City.  Dr. Sneller formerly practiced at a clinic on South
Lakeport Drive in an office that offered only chiropractic
services.  Sometime in 2001, Dr. Sneller decided that he would
like to build a new clinic.  He was operating at capacity at his

2

clinic on Lakeport and needed a larger building. He wanted to own the building rather than lease it from someone else. He wanted also to change his business from a chiropractic office to a clinic offering additional health services.

In the fall of 2001, Dr. Sneller met Olson. Olson managed Naps Alabama Barbeque and Dr. Sneller was a customer of the restaurant. Dr. Sneller spoke with Olson about his plans to build a new clinic. He told Olson that he wanted to expand his practice, needed more room, and would be hiring a new chiropractor. Olson represented himself as the ideal person to manage the project.

Olson told Dr. Sneller of his construction experience with the River Valley housing development, the Naps restaurant building, and the Correctionville medical clinic. Olson stated that his experience with the Correctionville clinic, in particular, would be an asset in building Dr. Sneller's clinic. Olson said he had access to workers who had built the Correctionville clinic, and their experience would make construction of Dr. Sneller's clinic more efficient. Olson said he was talking with Mercy Medical Center about doing another clinic. Dr. Sneller would have to decide quickly whether to hire him, Olson said, or he might get tied up with a new job.

Olson's duties as project manager would include bidding out the construction jobs competitively. Olson would coordinate the workers and keep the project on schedule. He would review invoices from subcontractors to ensure that Dr. Sneller was

staying within budget and was not being over-billed for the work.

Sometime in November 2001, Olson took Dr. Sneller to Correctionville in the evening and gave him an after-hours tour of the clinic.  Olson had with him a few sheets of architectural drawings, including a floor plan and elevation views.  The latter drawings showed what the outside of the building would look like on each side.  Olson represented to Dr. Sneller that he owned the full set of blueprints and that the plans were those he had used in construction of the Correctionville clinic.  Olson told Dr. Sneller that it would take from $50,000 to $100,000 in architectural fees to design "from scratch" the type of medical building that Dr. Sneller wanted to have built.  Olson represented that Dr. Sneller would be able to use the full set of blueprints for his clinic, saving a significant sum of money.  Olson said the only necessary changes would be to the inside walls, which would cost Dr. Sneller "next to nothing" in architectural fees.

A full set of blueprints consists of several sheets.  A floor plan is a drawing of the basic layout of the rooms in a building. A floor plan shows where the walls and the openings in the walls for doors and windows are located .  A set of blueprints would contain a separate sheet for each component of the construction of the building, such as electrical work and plumbing.  Other sheets show such items as the sizes of doors, locations of light fixtures, and types of finishes to be used on the walls, floors and ceilings in each room.  The full set of plans includes exterior and interior views.

4

Dr. Sneller agreed to hire Olson for the project. Olson drafted a "Project Manager Agreement" between Integrated and Castle Rock Development. Dr. Sneller reviewed the contract document with family members and negotiated with Olson for some changes in the contract. The parties executed the contract on November 28, 2001.

The agreement described the project as follows:

> Castle Rock will act as project manager for the construction [sic] a 7000 square foot building to be built in Sioux City, Woodbury County, Iowa pursuant to the specifications, architectural drawings, or other documentation in a good and workmanlike manner satisfactory to Integrated. . . . All architectural drawings, specifications and other documentation shall be supplied by Integrated. Castle Rock will supervise and arrange for the necessary labor, equipment, tools and materials needed to construction [sic] the building and for landscaping. The work will be constructed in conformance with these plans and specifications.

Exhibit 1.

The contract provided that construction would begin December 15, 2001 and would be completed no later than May 1, 2002. The completion date was important to Dr. Sneller, because the lease on his clinic on Lakeport Drive was to expire on April 30, 2002. The owner wanted to sell the building and wanted the property vacated. Dr. Sneller communicated the importance of the completion date to Olson, and Olson assured Dr. Sneller that he would be able to meet this deadline.

Under the terms of the contract, Castle Rock was solely responsible for the supervision of construction of the clinic. Integrated agreed to pay for all construction costs, including

labor and materials.  Castle Rock agreed to provide liability insurance for the work site until completion of the project.

At about the same time the parties entered into the agreement, Olson provided Dr. Sneller with an itemized estimate of the total cost of the project.  The estimate allocated $327,735.00 for purchase and development of land.  With the addition of $483,792.71 for building costs, $418,719.42 for project management fees and $20,000 for architectural prints, the total project cost was estimated at $1,250,247.13.

After the walk-through of the Correctionville clinic, Dr. Sneller told Olson that his Multi Care clinic would need some larger rooms.  An added section was sketched into the floor plan of the Correctionville clinic.  See Exhibit 29, pages 2-3.  Olson represented to Dr. Sneller that the budgeted figure for architectural prints was a high estimate.  Olson said the money would cover the plans for the added section and any change orders.

The project manager contract document initially provided that Castle Rock would receive a fee of 30% of the total project cost. The estimate of project costs included an item for project management fees.  Dr. Sneller interpreted the contract to mean that Castle Rock would receive a 30% fee on top of the line item amount for its project management fees.  Dr. Sneller negotiated a change in the contract.  A handwritten notation was added to the document stating that "contractor gets 36.56% of project cost as determined by bill invoice."  The change was based on Dr. Sneller's understanding that the total "project cost" would not

6

include the project manager's fee.  Dr. Sneller estimated that,
with this change, the project would cost $120 per square foot.
The revised estimated total cost was $1,235,805.13.

The contract document initially provided that 50 per cent of
the project manager fee was payable upon the execution of the
document.  Olson agreed to accept payment of the first half of the
fee upon the commencement of activity on the building site.  Olson
said he needed a large portion of his fee up front in order to
initiate work on the project.  Olson represented that one use of
the money would be to "float" bills, such as equipment rental.
Dr. Sneller wrote a check to Castle Rock for $152,000 on December
19, 2001.  Olson deposited the check into his Naps restaurant bank
account.  None of the money was used for the clinic project.

Olson took Dr. Sneller to several locations to view possible
sites for the clinic.  Olson told Dr. Sneller that the
requirements for design and construction of buildings were more
stringent in the city of Sioux City than in other areas.  Olson
encouraged Dr. Sneller to look at locations outside the city
limits of Sioux City in order to reduce building costs.

Dr. Sneller located the Stadium Drive site on which the Multi
Care clinic was eventually built.  He negotiated directly with the
owner for a price of $134,000.  The price included the cost of
earthwork to prepare the site.  Four or five feet of dirt was
brought to the site and was compacted.  The site preparation was
completed before Dr. Sneller paid the purchase price and obtained
a deed.  He signed the purchase agreement December 18, 2001.

7

Additional dirt work was performed by Goldsmith & Sons in early January 2002. Olson arranged for Goldsmith to build up the site with an 18-inch pad of soil so that rain would run away from the building. The cost of this work was $3,000.

On about December 27, 2001, Dan Moos Construction Co. provided Olson with an estimate for concrete work for Dr. Sneller's clinic. The estimate included the following items:

| | |
|---|---|
| Excavation of footings | $ 2,604.00 |
| Concrete footing labor & material 24" x 4' w/foam | 12,282.00 |
| Concrete footing labor & material 24" x 4' | 2,574.00 |
| top wall 12" x 6" w/anchors | 3,689.00 |

Exhibit 4. These items total $21,149.00. "Excavation of footings" means to dig a trench below frost level to prepare for pouring the concrete footings.

Sometime in December, Dan Moos Construction Co. did excavation for footings and poured concrete footings. After the work was completed, Olson telephoned Jeff Dahl of Moos Construction and asked Moos to eliminate the word "excavation" from its estimate. In response, Moos Construction prepared Exhibit 52, an invoice in the amount of $21,149.00 dated December 31, 2001, addressed to Stephan Olson, 4229 S. Lakeport, Sioux City. The invoice contained the following items:

| | |
|---|---|
| Concrete footing labor & material 24" x 4' w/foam | $14,062.00 |
| Concrete footing labor & material 24" x 4' | 2,964.00 |
| top wall 12" x 6" w/anchors | 4,123.00 |

The bottom of the document stated, "Please sign this estimate to indicate your approval."

8

Moos Construction prepared a nearly identical invoice dated January 21, 2002.  Exhibit 3, page 2.

Olson prepared an invoice dated January 30, 2002 from Castle Rock to Integrated in the amount of $41,655.00.  The invoice directed Integrated to make its check payable to Castle Rock.  The invoice consisted of these items:

| | |
|---|---|
| Concrete footings labor & materials | $21,149.00 |
| Site excavation | 18,000.00 |
| Building permit fee | 2,608.00 |

Exhibit 5.

Dr. Sneller paid the Moos Construction invoice directly to Moos Construction on February 4, 2002.  Larry Stinger, a representative of Moos, picked up the check and signed a lien waiver in Dr. Sneller's office.  On February 8, Stinger signed a statement that Moos Construction had done all the footings work, including footing excavation.

When Dr. Sneller received the invoice from Castle Rock, he believed it contained items for which he had already paid.  He showed the invoice to Dale McKinney, architect for the project.  McKinney advised Dr. Sneller that the charges for installing the footings were too high, based on the measurement of the footings and the amount of footing excavation work that needed to be done.

Dr. Sneller confronted Olson about the bill for excavation.  Olson insisted that some of his "Correctionville boys" had done the work.  At trial Olson testified that he had prepared the invoice before the work was completed, and he thought someone other than Moos Construction had done the work.  He said the

9

invoice was a mistake.

Olson prepared another invoice from Castle Rock to Integrated, dated February 14, 2002, in the amount of $17,500. The invoice consisted of these items:

| | |
|---|---|
| Equipment rental/backhoe, trencher, skidloader, lazer site, etc. | $6,000.00 |
| Building permit fee | 2,500.00 |
| Payroll & payroll taxes paid | 9,000.00 |

Exhibit 6. Olson did not provide documentation to explain these charges, despite numerous requests from Dr. Sneller. Olson signed a lien waiver dated February 8, 2002 for the amount of $17,500. Exhibit 54. There is no evidence, however, that Dr. Sneller paid the invoice.

In about late 1999, Olson obtained architectural drawings for a clinic that had been built in Mapleton. Olson testified that he obtained the plans from a Dr. Hesse, but the evidence did not reveal Dr. Hesse's connection to the clinic or the specific circumstances of Olson's acquisition of the plans. Olson wanted to use the plans for the clinic he was planning to build in Correctionville. He tried to have copies of the plans made at Sioux City Blueprint. He was told that the plans could not be copied because they were owned by the architectural firm now known as Cannon, Moss, Brygger & Associates.

Olson met with Jim Ruble and Jim Brygger of the firm. Olson told the architects that he liked the floor plan of the Mapleton clinic and wanted to use it in the clinic he was planning to build in Correctionville. Ruble and Brygger told him that their design

would have to be modified before Olson could use it.  They explained that the clinic was designed for a particular client, and that the design could not be used directly in another building.  Ruble testified that controls over the copying of blueprints are matters of safety concerns, ethical conduct toward the previous client, and protection of the architect's copyrighted interest in the work.

Olson expressed his intention to omit part of the Mapleton clinic design in the design for his building in Correctionville. Ruble's firm made a proposal to make the modifications for Olson for approximately $30,000.  This amount was more than Olson wanted to spend.

Olson then took the Mapleton clinic blueprints to Wil Gerking, a draftsman.  Olson asked Gerking to make changes to the plans for use in the Correctionville clinic.  Olson led Gerking to believe that Olson's firm owned the prints.  Gerking was initially reluctant to make the changes, because he was aware of copyright law.  Gerking was persuaded that he would not be "plagiarizing" the drawings, because he would be making substantial changes to the plans.  Olson paid Gerking $500.00 to do the drawings.

Some time after making the drawings for Olson, Gerking was contacted by an attorney for the Cannon, Moss, Brygger firm.  The firm claimed that Gerking's use of the Mapleton clinic blueprints was an infringement of its rights in the prints.  Gerking testified that the firm initially sought to impose on him a $20,000 "fine."  The matter was resolved without a lawsuit.

Dale McKinney is an architect with InVision Architecture.
McKinney first met Olson when McKinney was asked by St. Luke's to
do some work at the Correctionville clinic.  Olson later asked
McKinney to be the design architect for Dr. Sneller's clinic.  In
late 2001, McKinney made a verbal agreement with Olson to do the
work for $20,000.  A written agreement, using an American
Institute of Architects form, was entered into on January 11,
2002.  The agreed compensation for the architect's services was a
lump sum of $32,000.  Exhibit 28, Article 1.5.1.  Olson was
designated "construction manager" in the contract document.
McKinney testified that under an AIA contract, the architect owns
the architectural plans for a project, unless otherwise specified.

When he first met with McKinney about the Sioux City project,
Olson brought two pages of drawings with him.  <u>See</u> Exhibit 29,
pages 2, 3.  Olson testified that these two pages were the work he
had paid Wil Gerking to do.  McKinney understood from Olson that
the drawings were based on plans for a building in Ida Grove and
that Wil Gerking had modified the plans for use in constructing
the clinic in Correctionville.  Olson hoped to use the same plans
for the clinic in Sioux City.  McKinney was led to believe that
Olson owned the plans.  He later learned that another architect
was involved in the design of the plans.

The architectural work began with the two pages provided by
Olson, a floor plan and a sketch of part of the floor plan drawn
to a different scale.  McKinney's firm used these drawings to
produce a full set of architectural drawings to be used in the

12

bidding and building processes.   The architectural work required much input from Dr. Sneller as the owner.   McKinney stated that communication was accomplished more efficiently by dealing directly with Dr. Sneller, rather than going through Olson.   He believed Olson's involvement delayed the project.

Olson told Dr. Sneller that he had taken a full set of blueprints to the architect to make changes to the floor plan.   In a letter dated January 8, 2002, Olson again represented to Dr. Sneller that his clinic would be based on the architectural drawings used in the Correctionville clinic.   Exhibit 10.

On February 26, 2002, Dr. Sneller discovered that another architect was involved with the architectural drawings that he had been shown by Olson.   He believed Olson was using "plagiarized" drawings.   Dr. Sneller asked InVision to redesign his clinic.   He did not explain to McKinney why he wanted the changes.   The locations of footings and entryways were changed.   The building shape was changed from an L-shape to a squared-off shape. Architectural fees for the project ultimately totaled approximately $62,000.

Dr. Sneller believed Olson had lied to him and could no longer be trusted.   On March 1, 2002, Dr. Sneller fired Olson from the job.   Dr. Sneller hired his father, Elmer Sneller, to act as project manager and paid him $50,000.   Elmer Sneller has worked for many years as an electrical contractor.

Dr. Sneller hired Liberty Contractors as general contractor for the project.   Liberty began working on the project in April

2002.  The clinic was not completed until October 2002.  The owner of the clinic at Dr. Sneller's former location allowed him to stay upon the condition of signing a six-month lease at the rate of $4,000 per month.  Dr. Sneller estimated that the delay in being able to move to the new clinic caused him to lose net revenue of $31,000 per month.

The cost of completing the new clinic exceeded the initial estimate by $130,500.  Dr. Sneller obtained additional financing by putting a second mortgage on his home.

Integrated filed an action against Olson and Castle Rock in the Iowa District Court for Woodbury County, Case No. LACV124688. On October 21, 2003, Integrated obtained default judgment against the defendants for $1,964,500, an amount that included an award of $1.5 million for punitive damages.  Olson filed an individual Chapter 7 petition on December 22, 2003.

## DISCUSSION

Integrated argues that its claim should be excepted from Olson's discharge under 11 U.S.C. §§ 523(a)(2)(A) and 523(a)(6).[1] Integrated bears the burden of proving nondischargeability by a preponderance of the evidence.  Grogan v. Garner, 111 S.Ct. 654 (1991).

---

[1] Integrated pleaded a claim under 11 U.S.C. § 523(a)(4), relating to debt for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny.  The court does not believe that Integrated proved the elements of § 523(a)(4) and concludes that Integrated has abandoned this claim.

Section 523(a)(2)(A)

Section 523(a)(2)(A) of the Bankruptcy Code excepts from a debtor's discharge any debt for "money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by . . . false pretenses, a false representation, or actual fraud . . . ."  To prove its claim under § 523(a)(2)(A), Integrated must show that—

1.  The debtor made a false representation.
2.  The debtor knew the representation was false at the time it was made.
3.  The representation was deliberately made for the purpose of deceiving the creditor.
4.  The creditor justifiably relied on the representation.
5.  The creditor sustained the alleged loss as the proximate result of the representation having been made.

Burt v. Maurer (In re Maurer), 256 B.R. 495, 500 (B.A.P. 8th Cir. 2000).

Integrated claims Olson made the following false representations: that Olson had expertise in construction, that Olson owned the blueprints shown to Dr. Sneller in November 2001, that Dr. Sneller could use the full set of blueprints, that this use would save Dr. Sneller tens of thousands of dollars in architectural fees, that the construction of the clinic would be performed in a good and workmanlike manner, that Olson would review invoices to ensure the project was staying within budget and that work was being properly billed, and that Olson would complete the project on schedule.

Olson may have "puffed" his qualifications, but he had in

fact constructed the Correctionville clinic and the Naps restaurant.  Dr. Sneller visited both buildings and saw them being occupied as going concerns.  Integrated has not shown that Olson falsely represented having the expertise to construct the Multi Care clinic.

Nor has Integrated shown that any of Olson's representations were knowingly false when he promised to construct the clinic in a workmanlike manner, to review the invoices, and to complete the project on time.  Olson had a financial incentive to complete the clinic to the satisfaction of Integrated.  There was no evidence that the scheduled completion date was unreasonable or that Olson knew when he signed the contract that he would not complete the project by May 1.

Olson submitted two invoices to be paid to Castle Rock, one purporting to be for footings and excavation and the other for equipment rental and payroll.  Exhibits 5, 6.  Olson testified that the first invoice was a mistake.  This explanation was not credible.  Olson offered no explanation as to the second invoice. The court finds that Olson presented the invoices, knowing they were false, in order to deceive Dr. Sneller and to obtain payment for expenses that were not incurred.  The evidence shows, however, that Dr. Sneller did not pay either invoice.  Therefore, Olson obtained nothing and Dr. Sneller sustained no damages as the proximate result of the false invoices.

During the tour of the Correctionville clinic in November 2001, Olson showed Dr. Sneller a few sheets of architectural

16

drawings.  He represented that the drawings were his property, that he would give Dr. Sneller access to the full set of drawings, and that there would be a nominal cost to modify the drawings for use in the Multi Care clinic.  He told Dr. Sneller that use of the drawings would save tens of thousands of dollars in project costs. These representations were false and Olson knew they were false.

Although it is unnecessary to this decision to identify precisely the architectural drawings shown to Dr. Sneller during the tour of the Correctionville clinic, the court finds they were something more than the two pages prepared by draftsman Wil Gerking.  A reasonable inference is that the drawings were those prepared by the Cannon, Moss architectural firm for the Mapleton clinic.  Olson had possession of the Mapleton clinic drawings. The only evidence that Olson acquired other drawings prior to November 2001 was the testimony relating to Gerking's work.  Even assuming the drawings were not those for the Mapleton clinic, the court finds that Olson misrepresented the manner in which existing architectural drawings would be used to construct the Multi Care clinic.

Olson knew from his discussions with Jim Ruble that architects retain a controlling interest in their drawings.  Ruble had explained to Olson that an architect may not copy one client's design for use in another client's building. Olson knew the use of architect's drawings in the manner he was proposing to Dr. Sneller would be unethical, if not in violation of copyright law.

Olson also knew that modification of the existing drawings

17

for use in another building would involve a substantial cost, in addition to the costs for design changes and change orders. When he budgeted $20,000 for architectural prints, Olson represented this amount was a high estimate of what would be needed to pay for the design of an added section and future change orders. Although he had taken only two pages of drawings to architect McKinney, Olson told Dr. Sneller that he had given the architect a full set of blueprints.

Olson made this series of misrepresentations regarding the architectural drawings in order to deceive Dr. Sneller. Olson made false statements regarding his rights in the drawings in order to induce Dr. Sneller to enter into the project management agreement for the Multi Care clinic. Olson made other false statements to conceal the manner in which the clinic was actually being designed and to cover up his prior false statements.

There was no evidence that Dr. Sneller had reason to believe Olson's representations regarding the architectural drawings were false. The court concludes that Dr. Sneller justifiably relied on these representations to his detriment.

The misrepresentations were material to the contract. See City of Ottumwa v. Poole, 687 N.W.2d 266, 269 (Iowa 2004) (elements to rescind contract based on fraudulent inducement). Dr. Sneller was led to believe he would save costs and gain efficiency by use of the architectural drawings. He fired Olson from the project when he came to believe that another architect's work was involved in the design of the drawings. The court

concludes Olson obtained $152,000 from Dr. Sneller by fraud. Olson's debt should be held nondischargeable to this extent.

Dr. Sneller claims that he suffered further damages as a result of Olson's fraud. Costs for the entire project exceeded the initial estimate by $130,500, including $42,000 in additional architectural fees. Dr. Sneller paid his father $50,000 to assume the role of project manager. The clinic was not completed until October 2002. Dr. Sneller paid $24,000 to lease his old premises for six months until he could move. He estimated a loss of profits of $186,000 because of the delay in completing the new clinic ($31,000 x six months).

None of these consequential damages are amounts of money that Olson obtained by fraud. Nor can it be said that these damages were proximately caused by fraud. Under the original contract, Dr. Sneller would have been obligated to pay Olson the balance of his project manager fee, approximately another $152,000. Dr. Sneller hired his father to manage the project. The evidence showed that the architectural firm InVision also assumed some of the duties that Olson would have performed. Dr. Sneller was not damaged by having to pay the fee instead to those who took over the job.

Architectural fees also increased because Dr. Sneller made the decision to make major changes to the design. InVision was hired to design the clinic based on a floor plan, and it was being paid to make substantial changes to the plan. The evidence did not show that InVision's use of the plans would have been

19

unethical, much less in violation of copyright law.  Dr. Sneller

made the decision to request changes in the plans, without

consulting anyone and without telling Dale McKinney why he was

doing it.  The additional fees were breach of contract damages, at

most.  Such damages are dischargeable.  <u>See</u> <u>Sandak v. Dobrayel (In

re Dobrayel)</u>, 287 B.R. 3, 24-25 (Bankr. S.D.N.Y. 2002)

(distinguishing between debts for money obtained by fraud and

damages resulting from debtor's failure to perform the contract).

        The additional costs for lease payments and the claimed loss

of profits were caused by the delay in completing the Multi Care

clinic.  The delay, in turn, was likely caused by a number of

things.  Changes were made to the design.  Weather may have been a

factor.  Even if the court assumes the delay was caused by Olson's

conduct, the lease payments and lost profits are damages for

breach of contract.  The court makes the same conclusion as to the

amount by which the project went over budget.  The damages are not

excepted from the discharge by § 523(a)(2)(A).

        Section 523(a)(2)(A) of the Bankruptcy Code excepts "any

debt" for money to the extent obtained by fraud.  The Supreme

Court in <u>Cohen v. de la Cruz</u>, 118 S.Ct. 1212 (1998), explained the

scope of damages made nondischargeable under this statute.  In

<u>Cohen v. de la Cruz</u>, debtor owned several residential properties

in the vicinity of Hoboken, New Jersey.  Debtor violated the local

rent control ordinance, and the rent control administrator

determined that he had charged $31,382.50 in excess rents.  When

debtor filed a Chapter 7 petition, the tenants filed an adversary

proceeding under § 523(a)(2)(A).  Plaintiffs requested a
determination that the debt was nondischargeable for fraud.  They
also requested an award of treble damages, attorney's fees and
costs pursuant to a New Jersey statute.   The bankruptcy court
ruled in plaintiffs' favor; the district court and Court of
Appeals for the Third Circuit affirmed.

On appeal to the Supreme Court, the debtor argued that the
treble damage award did not constitute money which he had
"obtained" by fraud.  The Court affirmed, holding that §
523(a)(2)(A) "prevents the discharge of all liability arising from
fraud." Id. at 1215.  The phrase "to the extent obtained by" does
not limit the debt excepted from discharge to the value of the
money the debtor obtained by fraud.  Id. at 1217.  The statutory
damages arose out of debtor's fraudulent conduct.  Therefore, the
treble damages were within the scope of the exception, even though
they were in the form of punitive damages.

In the case now before the court, Integrated seeks to have
all its damages held nondischargeable.  As discussed above, some
of Integrated's damages were for breach of contract and were not
proximately caused by fraud.  The state court judgment to the
extent of those damages will not be excepted from the discharge.
The award of punitive damages, however, is attributable at least
in part to Olson's fraud.  The court will assume that the state
court took into account the total amount of compensatory damages
in fixing the amount of punitive damages.  See Green v. Pawlinski
(In re Pawlinski), 170 B.R. 380 (Bankr. N.D. Ill. 1994) (holding

21

attorney fees and punitive damages nondischargeable in same

proportion of entire award as compensatory damages held

nondischargeable).

The court concludes that compensatory damages of $152,000

should be excepted from Olson's discharge.  This amount is

approximately 33 percent of the total award for compensatory

damages.  Thirty-three percent of the awards for attorney fees

($10,500) and punitive damages ($1,500,000) is $498,465.  The

court will find this amount nondischargeable as well.


<u>Section 523(a)(6)</u>

Section 523(a)(6) of the Bankruptcy Code excepts from a

debtor's discharge any debt for "willful and malicious injury."

This court recently outlined the definition of this phrase.

> "Willful" means deliberate or intentional.  The injury,
> not just the act causing injury, must be intended.  To
> be malicious, the debtor's conduct must be targeted at
> the creditor in the sense that conduct is certain, or
> almost certain, to cause harm.  The conduct must "be
> more culpable than that which is in reckless disregard
> of creditors' economic interests and expectancies, as
> distinguished from mere legal rights.  Moreover,
> knowledge that legal rights are being violated is
> insufficient to establish malice, absent some additional
> 'aggravated circumstances' . . . ."

<u>First Federal Bank v. Mulder (In re Mulder)</u>, 306 B.R. 265, 270

(Bankr. N.D. Iowa 2004) (quoting <u>Barclays American/Business</u>

<u>Credit, Inc. v. Long (In re Long)</u>, 774 F.2d 875 (8th Cir. 1985),

and citing <u>Johnson v. Logue (In re Logue)</u>, 294 B.R. 59 (B.A.P. 8th

Cir. 2003)); <u>see also</u> <u>Geiger v. Kawaauhau (In re Geiger)</u>, 113 F.3d

848 (8th Cir. 1997), <u>aff'd</u>, 118 S.Ct. 974 (1998).

Integrated argues that Olson used fraudulently obtained architectural drawings and made misrepresentations, knowing that his conduct would cause financial harm to Integrated. The court makes no conclusion as to how Olson acquired the drawings he showed to Dr. Sneller during the tour of the Correctionville clinic. Olson's improper use of the drawings was in his misrepresentations to Dr. Sneller. Thus, Integrated alleges as culpable conduct under § 523(a)(6) the same conduct complained of in its claim under § 523(a)(2)(A).

Integrated's position is that Olson's fraud also constitutes willful and malicious injury. It contends that its claim under § 523(a)(6) entitles it to a determination that its entire state court judgment is nondischargeable.

The creditor in Berkson v. Gulevsky (In re Gulevsky), 362 F.3d 961 (7th Cir. 2004), made a similar argument. In that case, the debtor orally misrepresented his financial condition, inducing the creditor to advance $100,000 on his behalf. The debtor never repaid the money, and the creditor obtained judgment for the sum. After the debtor filed a bankruptcy petition, the creditor filed an adversary proceeding under 11 U.S.C. §§ 523(a)(2)(B) and 523(a)(6). The bankruptcy court dismissed the complaint for failure to state a claim and the district court affirmed.

The Seventh Circuit affirmed. The court was guided by two principles of statutory construction. "Exceptions to discharge are to be construed narrowly, and the subsections of § 523 should not be construed to make others superfluous." In re Gulevsky, 362

23

F.3d at 963 (citing In re Geiger, 118 S.Ct. at 977).  Gulevsky's

conduct was not actionable under § 523(a)(2)(B), because his

statements were not in writing.  The circuit court agreed with the

lower courts that allowing the creditor to proceed under §

523(a)(6) "would render the writing requirement of § 523(a)(2)(B)

superfluous." Id. at 963.  The court recognized that fraud is an

intentional tort and that § 523(a)(6) excepts many intentional

tort claims from discharge.  Id.  However, the court rejected the

notion that all debts procured by fraud are claims for willful and

malicious injury.  Id. at 964.

This court agrees with the Seventh Circuit's analysis.

Moreover, Integrated has failed to prove malice under the

standards applicable in the Eighth Circuit.  The claim under §

523(a)(6) should be dismissed.

IT IS ORDERED that the judgment arising in the Iowa District

Court for Woodbury County, Case No. LACV124688, in favor of

Integrated Practice Management and against Stephan Olson is

nondischargeable to the extent of $650,465 pursuant to 11 U.S.C. §

523(a)(2)(A).

IT IS FURTHER ORDERED that the claims of Integrated Practice

Management against Stephan Olson pursuant to 11 U.S.C. §§

523(a)(4) and 523(a)(6) are dismissed.  Judgment shall enter

accordingly.

DATED AND ENTERED: April 21, 2005

William L. Edmonds, Bankruptcy Judge